Let's wait just a minute while the courtroom clears. All right, our second case for this morning is Gary Jet Center v. AFCO AvPORTS Management. Mr. Harreld. Thank you, Your Honor. May it please the Court? The district court erred in dismissing Gary Jet Center's claim under the contracts clause of the Constitution for two reasons. First, the district court thought that Gary Jet Center's claim was not plausible because Gary Jet Center had not yet tested its breach of the lease claim in state court to determine whether it had a remedy for that. So, Mr. Harreld, I have to ask you. I am baffled that this complaint did not include, under the supplemental jurisdiction or in any other way, an account that there was, in fact, a breach of this contract. Without a breach, so I guess that's my first point. I don't see why that's not there. Secondly, you're relying on a lot of these contract clause cases and the notion that the regulating authority actually makes it impossible to bring a suit. But essentially, your argument is just that after 2014, you were left with a bad contract, so the price ballooned up fourfold and it was a much worse financial deal for you. People make bad financial contracts all the time. It doesn't mean they aren't contracts. It means that they were a bad deal. Gary Jet still has access to the airport. It's still entitled to perform the services. So both of those things confuse me about this case. And if I just might add, and me as well, or I as well, because I have tried and tried and tried to figure out what action the authority has taken that could actually be considered a breach of contract. I don't see it. Sure, Your Honor. Let me address that point first. The reason why we brought a contract clause claim was because we didn't really see this as a breach of contract case. And here's fundamentally why, I think. Because, you know, as the facts as we've alleged them, which isn't a complaint, this gross revenue fee was specifically negotiated away in 2007 by the parties in their lease. And then in 2014, when this lease amendment was entered into, which the authority now relies on as a claim that we agreed to this gross revenue fee, at that time the authority had taken away this gross revenue fee for all time. It had taken it off the table. It had waived it from the minimum standards. And what was going to happen, and this is the settlement of the previous case, was that essentially there was going to be a rulemaking process for new minimum standards. The authority was going to develop these new minimum standards, which were not going to include a gross revenue fee. They were going to give the parties time to comment on them, and you'll see that in the settlement agreement, which is Tashkirah Jetson's complaint in the record. And then these new regulations were going to be implemented. And when that settlement was entered into, this lease amendment was entered into, and the idea was now that there's two competing FBOs at the airport, there had to be rules that applied across the board, and Gary Jetson agreed to that, which is why we agreed to subject our lease to these new minimum standards, which were going to be developed through this rulemaking process that the parties had agreed to act in good faith to develop. And what happened was, late in that process, after several drafts had gone back and forth that did not include a gross revenue fee, the authority inserted this gross revenue fee at the 11th hour, and which we have alleged it was at the result of this management company at the airport because this fee was going to bring them substantial payday under their contract with the authority. And it was something that Gary Jetson had never agreed to and would quadruple what we had to pay. Gary Jetson immediately objected to that, and the response that we got was, well, now that your lease is subject to our rules, you're bound by this gross revenue fee regardless of whether you've actually agreed to it or not. And that's why there's a contract clause violation. Gary Jetson doesn't feel like we're talking, if we're talking about contract, we're talking about what the parties contemplated, what they agreed to. But given, I mean, given Gary Jetson's knowledge of the gross revenue fee provisions at the time of both the 2007 lease and the 2014 amendment, how could you not have anticipated that the gross revenue fee would now be a part of the new minimum standards? And if that was foreseen, isn't the language agreeing that the minimum standards would supersede other lease terms in agreement to pay those fees? Your Honor, that's a fact question. And as we've alleged, I mean, obviously this gross revenue fee was a big deal, which is why in 2007 it was specifically negotiated away. And that's also why in 2014 it was specifically waived in the settlement agreement. But in a very strange way, and I just want to throw in two additional thoughts. One is, if you just had an ordinary contract between A and B, you know, A is going to sell B 1,000 units of something and B is going to pay some money. And then all of a sudden B sends a message to A saying, well, I'm adding one more clause to the contract. All disputes are going to be arbitrated. Well, A may say, you know, that's, you can't do that. You know, that's not part of our agreement. It would breach the agreement if you insisted on arbitration or what have you. So the law of contract accommodates pretty easily the addition of new provisions. There's all sorts of stuff in the UCC about that, among other places, 2207. So that doesn't bother me too much. And I feel as though you're inverting the contract clause. What the Supreme Court said in such cases as United States Trust against New Jersey is that you need more than just a simple breach of contract before you're going to see an impairment of a contract for purposes of the clause. But it doesn't mean that you don't at least need a breach. I mean, how could you have a substantial impairment, a change in law that has impaired the relationship and the impairment is substantial? You're always going to have that. So it's like breach plus. It's not just freestanding, you know, we've done something you don't like. Yes, Your Honor. I think what the issue and the way that we read those cases in the contract clause is the idea that the basis for what the governmental entity's action is, is this idea that we're outside of contract land and that we can bind you because we're your regulator. And that's the argument in E. and E. Hauling references, that contemporary music group case. But it doesn't mean that when they do that, the first thing that has to happen is that what they do diminishes your rights under the contract to the point where there's been a substantial impairment. Now that's just a different way of saying breaches your contract. Any other diminishment of rights under a contract, like an arbitration clause or whatever, you would just say that's a breach of contract. But it's got to be more than that. And that's correct. I mean, I think if we're in contract land, this is certainly a breach. But you didn't plead that, though. We didn't. That's true, Your Honor. And we didn't do that because we expected the argument. That you agreed to it, that you got rid of that clause that said the contract prevailed over the FBO rules. 2014, it changes it. There's, what, like a year and a half or so where you're protected and then that time expires. And it looks as though in exchange for whatever else you may have gotten, you agreed to a new arrangement. That's not what we've alleged, Your Honor. We've alleged that at the time we entered into that lease amendment, no one contemplated this gross revenue fee was coming back. And I really want to direct you to the allegations that we made in our complaint. It's at the supplemental appendix, pages 35 and 36, paragraphs 100 to 104. And that's really the crux of it. You know, and why this isn't, in our view, not a breach of contract case is really for the same reason articulated by the city of Santa Ana in the Ninth Circuit. It's not that, again, taking the facts as we've alleged, which is the pleading stage, the allegation is this gross revenue fee was not specifically contemplated by the parties in their contract, including at the time of that 2014 lease amendment. If that's the case, then the basis that the authority has to rely on is not that this gross revenue fee was specifically contemplated, although that's their argument here on appeal. I think that's what their brief is arguing. It wasn't what they were arguing below. What they were arguing below was simply by virtue of the fact that we now have this 2014 lease amendment, which subjects your lease to our lawmaking powers. We can now make a law that undoes an essential material term of the contract, which is how much we're going to pay to use the space. And that's why, I mean, really it's... Has everything actually happened yet with respect to this? Is this all just sort of a preliminary hypothetical debate? Have you been paying the extra money? Your Honor, we have not. The authority has demanded it, though. I see him in my rebuttal time. Okay, you can save your rebuttal time. Mr. O'Hagan. Thank you. Kevin O'Hagan on behalf of Gary Chicago International Airport, Stephen Mays, Denise Dillard, Mr. Pritchett, Cooper, and Irving, and Avports as well, Your Honor. At base level here, we do not have a new enactment that is impairing their contract. Is the authority reserving the right to rely on its regulatory authority to try and collect the gross revenue fees if the court determined that the amendment in 2014 didn't subject Garycheck to the gross revenue fee provision, you know, by its contractual language? Well, Your Honor, that was the whole point of that concession argument that I should have conceded at the district court level that I would never raise the minimum standards as being valid and authoritative as to be able to run an airport. And the reason we didn't do that is, A, they didn't reach a contract action for the 2007 lease, so I'm in a position of having to concede a potential argument relating to the validity of the minimum standards, which are embedded inside the lease agreements. They're mentioned in the lease agreement. They're part of the contract. These go hand in glove. So my concern there is a blanket waiver of the validity and the authority of these minimum standards would have been, I don't know what a state court would have done with that. And as a trial lawyer, making a blanket waiver in district court relating to the validity of those standards presented to me potential problems down the road that have nothing to do with the, but to answer your other question about whether or not we could rely on the contract, the standards and the leases go hand in hand and they're mentioned within each other. So everything the council has argued relating to whether there was an agreement, what the agreement was, those are all contract construction issues. Well, but here's what worries me about this. It does seem that the parties had a course of conduct, I'll say, which involved particular negotiation about this 1.5% fee on gross revenues. And you have it all the way back to the early 90s, and you've got it in 2007, and it's going forward. And, indeed, there comes a time when, in lieu of that, Gary Jett is told, no, we're not going to pay in that form, but we have this other supplemental rent form that we're going to have you pay. And now, as far as I can tell, they're still having to pay the supplemental, and then on top of that they're paying the 1.5%. And so it seems to me it changes this course of dealing between the parties in which there was going to be an express negotiation about the price of the contract, and there's hardly any term of a contract that's more important than the price. So I can see where Gary Jett is saying, wait a minute, when we said you could have these FBO rules, maybe that's how many hours you're open or how many gas lines you're going to have or whatever. There are all sorts of things that you regulate in an airport. But a fundamental provision, such as the price of the contract, where you're happily collecting the alternative price, as far as I can tell, is quite troublesome. Well, first to respond to that, it's nothing new. The minimum standards had always contained a gross revenue fee. But not for these parties, though. That is correct, Your Honor. But in 2014, there's a settlement agreement, and in that settlement agreement specifically says until the new minimum standards are in effect, the authority agrees to waive the requirements in sections, and the most important one is 7A7, which is the one that exempts them from the gross revenue fee, until the new minimum standards come out. And the new minimum standards do come out. And also within the only amendment to the lease. I'm going to focus on this word until because, I mean, what Gary Jett is saying is, you know, maybe at best that means there's a renegotiation then or something. You know, we get rid of the supplemental obligations, and you're in a have-your-cake-and-eat-it-too situation, it seems. Also, the 2014 amendment, the only change to the contract, the only amendment is to do exactly what Your Honor said before, which was to flip whether the lease controlled or the minimum standards. Now, if you understand the minimum standards in the lease, they go, like I said, hand-in-glove in the operation of an airport. The minimum standards become part of this contract. What are other examples of minimum standards other than this fee? There's the fuel farm maintenance, any number of things, safety issues, how you conduct yourself on an airport. They're pretty substantial. It's really one of the main ways. It's a big document. Yes, and it's one of the main ways that an airport can even operate something as important as an airport. Do you think that, I don't know, well, do you think that by dismissing the case without prejudice, Judge von Backlund was leaving open the possibility of a future suit if the contracts clause issue became what he viewed as a real rather than a speculative issue? It's difficult for me to speculate as to what was in his mind. However, I was there the whole time, and he did have some trouble getting around that issue, and I believe that is correct. Without prejudice means that if we go back to state court and we raise this defense to a claim, I might add, that hasn't even been brought yet on a breach of contract, if we do that, then perhaps it would leave open the possibility that we're inappropriately enacting some new legislations coming out from the outside to affect the parties' contractual relationships in such a way that we wipe out their remedy. I think that may have been his concern. I've been trying to figure out in a contract sense who breached what. You raised the price. You say with justification. They say no. So whether they're saying you anticipatorily breached the contract, they're now, I guess you've been demanding the payments and they're not paying. Is that where we are? That is correct. You're certain that the only breach in the case is Gary Jett's refusal to pay the gross revenue fee? Well, we haven't even really brought that case yet. To this day, Gary Jett Center is operating over at the airport right now, refueling planes for Boeing and whomever else. So there has really been no impairment of any sort of their activities there. But what is the bottom line owed in your view? Oh, I'm sorry. I don't know that exact amount. It's okay. Well, actually, one reason we don't know that is because one of the other things in the minimum standards, the new minimum standards, is we'd like to get an idea as to how much gross revenue Gary Jett Center is actually making off of their activities at our airport. And they refuse to give us those numbers. And no discovery on those numbers? Well, we didn't get that far. They also challenged the validity of that standard asking for those financials. Okay. Why can't you bring easy cases, all of you? I agree. This is difficult. So getting back to my original argument, they really haven't been left without a remedy. They could easily go to state court. One thing I would like to point out is the 2007 lease, and maybe this is they say that one of the reasons that they didn't want to bring that case in the case they should have brought it in, the breach of the 2007 actual agreement, the lease, that exempts them from gross revenue fees. That's this other company, right, this Eastlake, whoever they are. Well, no, the 2007 lease is with. Oh, but the settlement, though, of the later litigation. Correct. But I think one thing that needs to be pointed out to this court is in the 2007 lease, and this may supply one of the reasons why that breach of that lease wasn't brought in this case with the district court, is that it was a choice of venue provision to go to Indiana state court in the event of a breach of that lease. They're saying that, well, we didn't do it because we anticipated that you would argue that our minimum standards somehow trump or whatever the lease. But in effect, they just didn't bring that case, in my view, because there was a choice of venue provision in it. Now, of course, just to state the obvious, if there were litigation in the state courts, whichever party thought this would be helpful could raise a federal contracts clause argument. Exactly. They could. I agree. All right. If you have no further questions. Apparently not. So thank you very much. Thank you so much. Thank you. Mr. Harold, you saved some time. Thank you, Your Honor. Just two quick points to address. One of the concerns, I think, is ripeness. This claim isn't ripe yet because we haven't tested the lease. That was clearly in Judge Van Valken's reasoning. But under this court's decision in E&E Hauling, and I'm quoting, a claim under the contract clause need not originate in a state court. And further, quote, the plaintiff need not first discover in a state court action that the law prevents a remedy for damages. So Garrett Jett Center doesn't think it had to start this case in the state court and come here. And really, the reason why is the Ninth Circuit's decision in the city of Santa Ana, which Garrett Jett Center believes controls the case. As the facts are alleged by Garrett Jett Center. Now we understand that the authority has a different view, and they're providing a different view of the facts in their brief. But we believe on the facts alleged in the complaint, Garrett Jett Center never agreed to a gross revenue fee that was going to quadruple their rents, and that this was inserted later. And that the justification, similar to the justification the city of Santa Ana was, there is a provision subjecting your lease to our regulation. We put in a new regulation. So tough, you're stuck to it whether you agree to it or not. What Garrett Jett Center really wants is just the argument to be limited to what Garrett Jett Center did or didn't agree to in that 2014 lease amendment. And if it's a question of whether Garrett Jett Center in 2014 agreed to a gross revenue fee or that was contemplated, Garrett Jett Center agrees. That's a contract dispute that should be had in state court. But the problem here is that the authority hasn't limited the argument to that. They're not, in the current posture, they're not bound to argue that Garrett Jett Center agreed to this gross revenue fee. All they need to show is that you're subject to our minimum standards. It's now in the minimum standards. Therefore, you're bound to pay. And that's what we believe to be the constitutional violation, which the city of Santa Ana addresses. Thank you, Your Honors. Thank you very much. Thanks to both counsel. We'll take the case under advisement.